IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 17, 2019

**JAWAUNE MASSEY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Sullivan County
No. C65760  William K. Rogers, Judge**

_____

**No. E2019-00616-CCA-R3-PC**

_____

The Petitioner, Jawaune Massey, appeals the post-conviction court's denial of his petition for post-conviction relief from his convictions of two counts of first degree premeditated murder, two counts of first degree felony murder, one count of especially aggravated robbery, one count of possessing twenty-six grams or more of cocaine for resale, one count of conspiracy to commit aggravated robbery, and one count of maintaining a dwelling where controlled substances are used or sold and his resulting effective sentence of two consecutive life terms.  On appeal, the Petitioner contends that trial counsel was ineffective for failing to object to the Petitioner's wearing a stun vest at trial.  Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

David S. Barnette, Jr., Kingsport, Tennessee, for the appellant, Jawaune Massey.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Barry Staubus, District Attorney General; and Joseph Eugene Perrin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

This case relates to the deaths of Jeffrin Nolan and Terrance Alexander on November 18, 2005, in Kingsport.  The evidence at trial showed that Nolan was in the business of selling cocaine and that he kept the cocaine in the back room of his candle store, which was really a "'front'" for his drug-selling business.  State v. Jawaune

Massey, No. E2013-01047-CCA-R3-CD, 2014 WL 3661490, at \*2 (Tenn. Crim. App. at Knoxville, July 23, 2014), perm. app. denied (Tenn. Nov. 20, 2014). On the day of the crimes, Alexander went to the candle store to pay Nolan some money that Alexander owed. Id. A group of individuals, which included the Petitioner, entered the shop to rob Nolan and shot both of the victims "execution style" in the head. See id. at \*21-22.

A Sullivan County Criminal Court Jury convicted the Petitioner of the first degree premeditated murder and the felony murder of Nolan, the first degree premeditated murder and the felony murder of Alexander, especially aggravated robbery, conspiracy to possess twenty-six grams or more of cocaine with intent to sell or deliver, possessing twenty-six grams or more of cocaine for resale, conspiracy to commit aggravated robbery, and maintaining a dwelling where controlled substances are used or sold. Id. at \*1. After a sentencing hearing, the trial court merged the first degree premeditated and felony murder convictions as to Nolan, merged the first degree premeditated and felony murder convictions as to Alexander, and ordered that the Petitioner serve two consecutive life sentences. Id. at \*19. The trial court sentenced the Petitioner as a Range I, standard offender to sixteen years for especially aggravated robbery, a Class A felony; ten years for conspiracy to possess twenty-six grams or more of cocaine for sale or delivery, a Class B felony; ten years for possession of twenty-six grams or more of cocaine for resale, a Class B felony; six years for conspiracy to commit aggravated robbery, a Class C felony; and three years for maintaining a dwelling where controlled substances are used or sold, a Class D felony. Id. The trial court ordered that the Petitioner serve the sentences concurrently with the life sentences for a total effective sentence of two consecutive life terms. Id.

On direct appeal of the Petitioner's convictions to this court, he argued, in pertinent part, that the evidence was insufficient to support the convictions and that the trial court should have conducted a hearing to determine whether a "'stun belt'" was a necessary restraint of the Petitioner at trial. Id. at \*1. Regarding sufficiency, this court found that the evidence was insufficient to support the Petitioner's convictions of conspiracy to possess twenty-six grams or more of cocaine with intent to sell or deliver and maintaining a dwelling where controlled substances are used or sold. Id. As to the use of the stun belt, this court found that the Petitioner was not entitled to plain error relief because the record did not demonstrate that he actually wore a stun belt during his trial. Id. at \*35.

After our supreme court denied the Petitioner's application for permission to appeal, he filed a timely pro se petition for post-conviction relief, claiming that he received the ineffective assistance of counsel at trial for several reasons. The post-conviction court appointed counsel, and post-conviction counsel filed an amended

petition, adding that the Petitioner received the ineffective assistance of counsel because trial counsel failed to object to the Petitioner's having to wear a stun vest during his trial.

At the evidentiary hearing, lead trial counsel testified for the Petitioner that the State filed a notice to seek the death penalty against the Petitioner and that lead counsel and co-counsel were appointed to represent him. This was a "multi-defendant" case, but the Petitioner was tried separately from his codefendants. Lead counsel acknowledged that the Petitioner was required to wear a stun belt or stun vest at trial. However, the Petitioner never exhibited any behavior that caused lead counsel to be concerned about lead counsel's safety or the safety of others. The Petitioner was "always pleasant" and was very cooperative. Lead counsel said the Petitioner was "a perfect gentleman at all times and respectful to the Court." Lead counsel did not request that the Petitioner wear the device.

Lead counsel testified that he and co-counsel had worked on cases in the Third Judicial District, which did not use stun belts, but that this was their first trial in the Second Judicial District. Therefore, they were unfamiliar with the use of a stun belt "other than it was some type of security device." Lead counsel explained, "I didn't have a lot of knowledge, before this trial started, about stun belts or the controversy, legal controversy that had arisen about stun belts. It was just lack of familiarity on my part." A case involving stun belts was "working its way through" the appellate courts at the time of the Petitioner's trial, but lead counsel was unaware of the case.

Lead counsel testified that the device worn by the Petitioner was "white or off-color, cream color. And it was either on the torso or . . . in the belt region. Maybe both." Someone in the courtroom wearing plain clothes controlled the device and could "throw a switch" if needed. Post-conviction counsel asked if the device was visible, and lead counsel answered, "I don't think so. I don't remember that - that issue. . . . I think that was the whole purpose of it, that you wouldn't see it." The defense provided clothes for the Petitioner to wear during the trial, and the Petitioner did not testify at trial. Lead counsel said that he did not recall any part of the device being visible to the jury and that he thought he "would have said something" if the device had been visible.

On cross-examination, lead counsel testified that he had been practicing criminal law since 1994, that thirty to fifty percent of his practice involved criminal law, and that he was death penalty qualified. He said he had participated in two dozen criminal trials and seven or eight murder trials. At some point, the State withdrew its notice to seek the death penalty in this case, so co-counsel was relieved from representation. However, co-counsel continued to assist lead counsel and was present during the Petitioner's trial.

- 3 -

Lead counsel acknowledged that a court officer was always "positioned" at the defense table before the jury entered the courtroom so that the jury would not see the Petitioner being escorted in and out of the courtroom. Lead counsel also acknowledged that he was seated beside the Petitioner throughout the trial and that the defense table was the farthest table from the jury. The Petitioner was "about six foot tall," he had "[s]omewhat of a criminal history," and the medical examiner had described the deaths of the victims as "execution style" killings. The State asked lead counsel if the Petitioner ever complained about the stun belt, and lead counsel responded, "[Co-counsel] reminded me at some point he might have said . . . on Day One that it was . . . slightly uncomfortable. But other than that, no." Lead counsel acknowledged that the Petitioner never complained about the stun belt interfering with the Petitioner's ability to communicate with trial counsel. Moreover, lead counsel never saw anything to indicate there was a problem with the device. The Petitioner went to trial in August 2012, but the opinion that addressed stun belts was not issued by our supreme court until February 2013.

Lead counsel testified that he raised the stun belt issue in the Petitioner's motion for new trial. During the hearing on the motion, the trial court asked lead counsel if lead counsel was scared of the Petitioner or if the Petitioner was hindered by the belt. Lead counsel said that he wanted to protect his client and that he told the trial court he did not want to answer the question. Lead counsel explained that he was "concerned about waiver" and that "I knew we were going to see this day."

The Petitioner testified that he was required to wear a stun "vest" during the trial and that it "covered [his] back and front . . . on [his] waist." The vest was "strapped" onto the Petitioner "when it was time to travel." He could feel the vest, and it was not comfortable. He stated, "They told me if I moved in any violent manner or anything, I will be shocked with a hundred thousand volts, something like that." The vest made the Petitioner feel uneasy because he could be shocked at any time and made him feel like a violent offender when he was not violent. Post-conviction counsel asked if the vest affected the Petitioner's ability to communicate with trial counsel, and the Petitioner answered, "Somewhat. Yes." Post-conviction counsel also asked if any part of the vest was visible, and the Petitioner said that cords were hanging out of the bottom of the vest on the left side. The vest had a remote control and was controlled by someone in the audience. Security officers were on the jury-side of the courtroom and in the back of the courtroom during the Petitioner's trial.

On cross-examination, the Petitioner testified that he wanted to testify at trial but that "the guy that had that dadgone remote called me all kinds of stuff and told me if I moved the wrong way that my [n*****] ass was going to be shocked." The Petitioner said that he told trial counsel about the threat after his trial and that he waited to reveal

- 4 -

the threat because he was scared. The Petitioner acknowledged that trial counsel spent a lot of time with him before trial and that he and lead counsel had a "great" relationship.

Co-counsel testified for the State that he had been practicing law since 1992 and that he retired in 2018. At the time of the Petitioner's trial, about fifty percent of co-counsel's practice involved criminal law. Co-counsel was death penalty qualified.

Co-counsel testified that after he was relieved from the Petitioner's case, lead counsel and the Petitioner wanted him to "stay on," so he continued to help lead counsel pro bono. Co-counsel said he spent seven hundred seventy-five hours out of court and seventy-five hours in court on the Petitioner's case. During the trial, lead counsel sat on one side of the Petitioner, and co-counsel sat on the other side so that both attorneys could talk with him. Co-counsel and lead counsel had worked together on other cases. However, the Petitioner's trial was their first murder trial in Sullivan County, and "it was a Sullivan County procedure where they wore a stun belt." If the Petitioner had worn shackles, the jury would have seen them. Co-counsel said that the Petitioner's stun vest was uncomfortable and that the Petitioner did not like wearing it. However, co-counsel did not remember having any problems communicating with the Petitioner, and the Petitioner never told co-counsel that a court officer had made an obscene threat.

In a written order, the post-conviction court denied the petition for post-conviction relief. At the outset of its discussion, the post-conviction court noted that the trial transcript did not refer to a stun vest. The post-conviction court also noted that the Petitioner was relying on Mobley v. State, 397 S.W.3d 70 (Tenn. 2013), which was filed six months after his trial, to argue that he was entitled to post-conviction relief. The post-conviction court concluded that the Petitioner was not entitled to relief under Mobley because there was no proof the jury ever saw the stun vest and because lead counsel testified that the Petitioner never complained about the stun vest. The post-conviction court noted that the Petitioner testified that the stun vest affected his ability to communicate with trial counsel "'somewhat'" and that the Petitioner testified that a court officer told him that his "'[n*****] ass'" was going to be shocked if he moved the wrong way. However, the post-conviction court found it "incredulous" that the Petitioner would not tell trial counsel about the threat, which called the Petitioner's credibility into question. Accordingly, the post-conviction court determined that the Petitioner failed to establish by clear and convincing evidence that he was entitled to post-conviction relief.

## II. Analysis

The Petitioner contends that he received the ineffective assistance of counsel because trial counsel failed to object to his having to wear a stun vest at trial. He asserts that the trial court should have held a hearing to determine whether the vest was

necessary, that the vest hindered his having "complete communication" with trial counsel, and that members of the jury "may have noticed signs of the vest." The State argues that the post-conviction court properly denied the petition for post-conviction relief. We agree with the State.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

In support of his claim that trial counsel was ineffective, the Petitioner maintains that he is entitled to relief under Mobley. This court addressed Mobley on direct appeal of the Petitioner's convictions, stating as follows:

> In Mobley v. State, 397 S.W.3d 70 (Tenn. 2013), our supreme court addressed for the first time the use of a stun belt "as an in-court restraint measure for criminal defendants," id. at 99, and concluded that trial courts should use the principles and procedures applicable to the use of shackles in determining whether a defendant should be required to wear a stun belt during his or her criminal trial. Id. at 101 (citing Willocks v. State, 546 S.W.2d 819 (Tenn. Crim. App. 1976)). Our high court elucidated:
>
> > To that end, we reiterate that there is a legal presumption against the use of in-court restraints. To justify the use of restraints, the State bears the burden of demonstrating necessity that serves a legitimate interest, such as preventing escape, protecting those present in the courtroom, or maintaining order during trial. The trial court should consider all relevant circumstances, including without limitation: (1) the defendant's circumstances, such as record of past behavior, temperament, and the desperateness of his or her situation; (2) the state of the courtroom and courthouse; (3) the defendant's physical condition; and (4) whether there is a less onerous but adequate means of providing security. The trial court should consider the relevant circumstances against the backdrop of affording the defendant the physical indicia of innocence, ensuring the defendant's ability to communicate with counsel, protecting the defendant's ability to participate in his or her defense and offer testimony in his or her own behalf, and maintaining a dignified judicial process.
>
> Id. (internal citations omitted).

Jawaune Massey, No. E2013-01047-CCA-R3-CD, 2014 WL 3661490, at *34-35.

Lead counsel and co-counsel testified at the evidentiary hearing that they were unfamiliar with the use of stun vests in the Sullivan County Criminal Court. Lead

counsel explained that a "legal controversy had arisen about stun belts" and that a case involving stun belts was "working its way through" the appellate courts at the time of the Petitioner's trial. Lead counsel said, though, that he was unaware of the case. However, even if trial counsel were deficient for failing to object to the Petitioner's having to wear the stun vest, which deprived the Petitioner of a pretrial hearing on the issue, the Petitioner has failed to show that he was prejudiced by the deficiency. The post-conviction court found that there was no proof the jury ever saw the stun vest and accredited lead counsel's testimony that the Petitioner never complained about the vest. The post-conviction court further found that although the Petitioner claimed the stun vest affected his ability to communicate with trial counsel, the Petitioner was not credible. Accordingly, we agree with the post-conviction court that the Petitioner failed to show that he is entitled to relief.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.


_____
NORMA MCGEE OGLE, JUDGE